Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IV-ESPECIAL

| CLARISE RODRÍGUEZ ARROYO<br><br>Recurrente<br><br><br>v.<br><br><br>ALBERIC MOTORS CORP.<br><br>Recurrido | TA2025RA00130 | *REVISIÓN ADMINISTRATIVA* procedente de la Oficina de Mediación y Arbitraje (OMA) del Departamento del Trabajo y Recursos Humanos<br><br>Caso número:<br>AC-23-024<br><br>Sobre:<br>Despido Injustificado (Ley Núm. 80 de 30 de mayo de 1976) |
|---|---|---|

Panel integrado por su presidenta, la jueza Ortiz Flores, la juez Aldebol Mora y la jueza Boria Vizcarrondo.

Aldebol Mora, Juez Ponente

# S E N T E N C I A

En San Juan, Puerto Rico, a 18 de agosto de 2025.

Comparece la parte recurrente, Clarise A. Rodríguez Arroyo mediante la presentación de un recurso de revisión judicial, y nos solicita que revoquemos la *Resolución y Orden* emitida por la Oficina de Mediación y Arbitraje adscrita al Departamento del Trabajo y Recursos Humanos de Puerto Rico.[1]

Mediante el referido dictamen, se ordenó la desestimación sumaria de la *Querella* instada por la parte recurrente por concepto de despido injustificado.

Por los fundamentos que expondremos a continuación, se confirma la *Resolución* recurrida. Veamos.

## I.

El 8 de febrero de 2023, Clarise A. Rodríguez Arroyo (Rodríguez Arroyo o recurrente) presentó una *Querella* ante la

---

[1] Apéndice del recurso, Anejo 2, págs. 5-97

Oficina de Mediación y Arbitraje (OMA) adscrita al Departamento del Trabajo y Recursos Humanos de Puerto Rico (DTRH), al amparo de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como la *Ley de Indemnización por Despido Injustificado*, 29 LPRA sec. 185 *et seq.* (Ley Núm. 80). [2] Alegó que laboró como vendedora de Alberic Motors, Corp. (Alberic o recurrida) desde el 12 de julio de 2012 hasta el 18 de enero de 2022, cuando fue despedida. La recurrente arguyó que, el 17 de enero de 2022, la reunieron sus supervisores para interrogarla sobre una patada que le efectuó a la mascota de Alberic, un gato llamado Silvestre. Rodríguez Arroyo indicó que su acción se debió a que el gato la asustó y que le tenía miedo a la mascota.[3] No obstante, argumentó que, al día siguiente, fue despedida a consecuencia de dicho evento. A tenor, indicó que Alberic la despidió injustificadamente y solicitó el pago de la mesada como indemnización.

Por su parte, el 15 de marzo de 2023, Alberic presentó una *Contestación a la Querella.* Adujo que el despido fue uno justificado debido a de que la recurrente desplegaba un patrón de conducta impropia y desordenada.[4] Asimismo, argumentó que, previo al suceso del gato Silvestre, la recurrente tenía un patrón de conducta hostil que laceraba los principios y normativas de Alberic. Por ende, ante el patrón de conducta desafiante de la recurrente y patear sin fundamento al gato Silvestre, Alberic despidió a Rodríguez Arroyo.

Culminado el descubrimiento de prueba, el 30 de enero de 2024, la OMA celebró una conferencia con antelación a la vista. Según surge de la *Minuta Resolución*[5] de dicha vista, las partes estipularon cuarenta (40) hechos incontrovertidos, en su mayoría,

---

[2] Apéndice del recurso, Anejo 1, págs. 1-4.
[3] Se desprende de la copia del video del incidente, que obra en el expediente administrativo que, la recurrente no le tenía miedo al felino y la patada fue intencional.
[4] *Íd.*, Anejo 4, págs. 100-102.
[5] *Íd.*, Anejo 5, págs. 103-110.

relacionados al historial de empleo de Rodríguez Arroyo y su patrón de conducta en Alberic.

Posteriormente, el 26 de marzo de 2024, la recurrida presentó una *Moción de sentencia sumaria* en la que expuso que el único asunto en controversia era si el despido de la recurrente fue justificado.[6] Por otro lado, Alberic propuso ciento dos (102) hechos incontrovertidos para disponer sumariamente del caso. Al respecto, la recurrida sostuvo que el patrón de conducta desafiante, las amonestaciones por su actitud en el empleo, las suspensiones por incumplir con la normativa de Alberic y agredir al gato llamado Silvestre fueron sucesos que constituyeron justa causa para el despido de Rodríguez Arroyo. Arguyó, además, que la recurrente reconoció en una deposición que tenía un carácter fuerte y no era fácil, y la Compañía la envió a tomar un taller de capacitación profesional. Asimismo, la recurrida enfatizó que, con la prueba documental anejada en la moción dispositiva, rebatió la presunción que le asistía a la recurrente en cuanto a que el despido fue injustificado tras ser contratada previo al año 2017 y, por tanto, no le aplica el estándar de prueba establecido en el Art. 1.2 de la Ley de Transformación y Flexibilidad Laboral, (Ley Núm.4), según enmendada, 29 LPRA sec. 121a. Por lo tanto, solicitó que se dictara sentencia sumaria desestimando la *Querella* incoada por Rodríguez Arroyo.

En desacuerdo, el 6 de mayo de 2024, Rodríguez Arroyo radicó una *Oposición a sentencia sumaria.*[7] En esencia, sostuvo que Alberic la despidió de manera arbitraria y caprichosa. Adujo, que su comportamiento no afectó el buen y normal funcionamiento de Alberic. Esgrimió que, Alberic no contaba con un protocolo de salud y seguridad acerca de mascotas en el concesionario de autos, por lo

---

[6] Apéndice del recurso, Anejo 6, págs. 111-242.
[7] *Íd.*, Anejo 8, págs. 243-487.

que la patada que le efectuó al gato Silvestre no justificaba su despido. En fin, Rodríguez Arroyo sostuvo que la despidieron por el incidente con el gato Silvestre y no por afectar el buen y normal funcionamiento de la empresa. Por lo tanto, solicitó que se declarara No Ha Lugar la *Moción de sentencia sumaria* promovida por Alberic.

El 6 de junio de 2024, la recurrida instó una *Réplica a oposición a sentencia sumaria* en la que argumentó que Rodríguez Arroyo omitió refutar en la oposición múltiples hechos que conllevaron a su despido.[8] A esos efectos, nuevamente esbozó los hechos incontrovertidos contemplados en la *Moción de sentencia sumaria* e indicó que la recurrente no anejó prueba documental que controvirtieran los eventos que acarrearon su despido. Incluso, insistió en que fue el patrón de conducta de Rodríguez Arroyo lo que conllevó su despido, y no la patada que le realizó al gato Silvestre.

El 8 de julio de 2024, la recurrente radicó una *Dúplica a solicitud de sentencia sumaria* en la que alegó que habían varios hechos en controversia que impedían disponer del caso sumariamente.[9] Ello, debido a que la OMA debía adjudicar la credibilidad de la prueba presentada por la recurrida relacionada a los hechos que conllevaron a su despido.

Así las cosas, el 11 de abril de 2025, notificada el 21 del mismo mes y año, la OMA emitió una *Resolución y Orden*[10] en la que formuló las siguientes determinaciones de hechos:

1. La parte querellada ALBERIC MOTORS, CORP. es una corporación creada y organizada bajo las leyes del Estado Libre Asociado de Puerto Rico.

2. Según surge del Registro de Corporaciones y Otras Personas Jurídicas del Departamento de Estado de Puerto Rico la dirección física de la querellada es Carretera #1, Km. 30.3, Bo. San Antonio, Caguas, Puerto Rico 00725.

3. Según surge del Registro de Corporaciones y Otras Personas Jurídicas del Departamento de Estado de Puerto

---

[8] Apéndice del recurso, Anejo 8, págs. 488-533.
[9] *Íd.*, Anejo 9, págs. 534-585.
[10] *Íd.*, Anejo 2, págs. 5-97.

Rico la dirección postal de la querellada es PO Box 70320, San Juan, Puerto Rico 00936-8320.

4. La parte querellada es una Corporación Íntima de jurisdicción doméstica, registrada con el número 155149 en el Departamento de Estado de Puerto Rico, con fines de lucro, desde el 8 de agosto de 2005 a las 1:58 PM y está activa, según surge del Registro de Corporaciones y Otras Personas Jurídicas.

5. Según acreditado por la parte querellada el número de teléfono del establecimiento es (787) 999-8888.

6. La parte querellada Alberic es un concesionario de autos que se dedica a vender automóviles nuevos y usados en Puerto Rico.

7. La querellante es mayor de edad y vecina de Caguas, Puerto Rico.

8. La querellante comenzó a trabajar para la parte querellada ocupando un puesto de vendedora también conocido como ejecutiva de ventas.

9. La querellante inició la relación laboral con la parte querellada el 12 de julio de 2012 a razón de DIEZ DÓLARES CON OCHENTA Y SIETE CENTAVOS ($10.87) la hora contra comisiones.

10. La querellante inició su relación laboral con la parte querellada mediante un contrato de empleo a tiempo indeterminado.

11. La querellante firmó un Contrato de Empleo Probatorio al iniciar su relación laboral el 12 de julio de 2012 en calidad de Vendedora con Alberic.

12. El 10 de octubre de 2012, la querellante aprobó el período probatorio de empleo con la querellada.

13. La querellante trabajó para la parte querellada hasta el 18 de enero de 2022.

14. El 8 de febrero do 2023, la querellante incoó ante la OMA del Departamento una querella contra la parte querellada de epígrafe aduciendo que fue despedida injustificadamente.

15. La querella de epígrafe no está prescrita conforme lo estipularon las partes.

16. La querellada, según fue estipulado, no tuvo limitación alguna para presentar sus defensas afirmativas y alegación responsiva ante este Foro sobre la reclamación por concepto de despido instada en su contra por la querellante al amparo de la Ley Núm. 80, *supra*, pre-promulgación de la Ley Núm. 4, *supra*.

17. La querellante trabajó nueve (9) años y seis (6) meses para la parte querellada.

18. La querellante devengaba ingresos semanales ascendentes a la suma de MIL OCHOCIENTOS SETENTA Y CUATRO DÓLARES CON TREINTA Y SIETE CENTAVOS ($1,874.37).

19. El salario anual más alto devengado por la querellante en los últimos tres (3) años que trabajó para la parte querellada ascendió a la suma de NOVENTA Y SIETE MIL CUATROCIENTOS SESENTA Y SIETE DÓLARES CON CUARENTA Y SEIS CENTAVOS ($97,467.46).

20. Las partes estipularon que, de proceder en Derecho, la querellante sería acreedora de la suma de VEINTICUATRO MIL TRESCIENTOS CUARENTA Y OCHO DÓLARES CON DOCE CENTAVOS ($24,348.12), correspondiente a tres (3) meses de salario por concepto de la mesada básica al palio de la Ley Núm. 80, *supra*, pre-promulgación de la Ley Núm. 4, *supra*.

21. Las partes estipularon que, de proceder en Derecho, la querellante sería acreedora de la indemnización progresiva al palio de la Ley Núm. 80, *supra*, pre-promulgación de la Ley Núm. 4, *supra*, correspondiente a dos (2) semanas de sueldo por cada uno de los nueve (9) años trabajados para la parte querellada, correspondiente a dieciocho (18) semanas.

22. Las partes estipularon que, de proceder en Derecho, la querellante sería acreedora de la suma de TREINTA Y TRES MIL SETECIENTOS TREINTA Y OCHO DÓLARES CON SETENTA Y CUATRO CENTAVOS ($33,738.74), correspondiente a la indemnización progresiva por concepto de despido injustificado al palio de la Ley Núm. 80, *supra*, pre-promulgación de la Ley Núm. 4, *supra*.

23. Las partes estipularon que, de proceder en Derecho, la querellante sería acreedora del remedio solicitado correspondiente a la indemnización por concepto de despido injustificado al palio de La Ley Núm. 80, *supra*, pre-promulgación de la Ley Núm. 4, *supra*, equivalente a la suma de CINCUENTA Y OCHO MIL, OCHENTA Y SEIS DÓLARES CON OCHENTA Y SEIS CENTAVOS ($58,086.86).

24. Como actividad regular del negocio la querellada archiva en el expediente de personal de cada empleado las amonestaciones disciplinarias que les imparte.

25. La querellante recibió amonestaciones disciplinarias mientras perduró la relación laboral con su expatrono.

26. Las amonestaciones disciplinarias que la parte querellada le entregó a la querellante fueron archivadas en su expediente de personal.

27. La querellante fue objeto de la acumulación de medidas disciplinarias impartidas por su expatrono constitutivas de su aplicación de disciplina progresiva.

28. El Foro le autorizó a la parte querellada para que le tomara una Deposición a la querellante como mecanismo de descubrimiento de prueba.

29. La querellante participó en la toma Deposición acompañada de su representante legal.

30. La querellante admitió que no cumplió con la meta de ventas establecida para agosto de 2012.

31. La querellante admitió que no cumplió con la meta de ventas establecida para enero de 2013.

32. La querellante admitió que no cumplió con la meta de ventas establecida para septiembre de 2013.

33. Las partes estipularon que la querellante fue suspendida de empleo y sueldo el 26 de septiembre de 2013, durante tres (3) semanas, reintegrándose a trabajar a la querellada el 18 de octubre de 2013.

34. La querellante admitió que no cumplió con la meta de ventas establecida para noviembre de 2013.

35. Las partes estipularon que las Empresas Alberic Colón, parte querellada, tiene cero tolerancia a las prácticas de alteración de documentos.

36. Las partes estipularon que la querellante admitió a los gerentes de financiamiento de la querellada, señores José López y José Ramírez, que había corregido la fecha de emisión de la certificación de empleo de la cliente Ruth Rodriguez Pillich.

37. Las partes estipularon que la querellada apercibió a la querellante "que, de surgir alguna otra situación de esta índole en una futura ocasión será justa causa para la separación inmediata de empleo".

38. La querellante admitió que no cumplió con la meta de ventas establecida para enero de 2014.

39. La querellante admitió que no cumplió con la meta de ventas establecida para octubre de 2015.

40. La querellante admitió que no cumplió con la meta de ventas establecida para noviembre de 2015.

41. Las partes estipularon que la querellante no cumplió con la meta de ventas establecida para enero de 2016.

42. Las partes estipularon que la querellante, a principio del mes de junio de 2016, presentó a la parte querellada su renuncia por escrito y la querellada la rechazó brindándole la oportunidad de recapacitación sobre tal decisión.

43. Las partes estipularon que la querellante no cumplió con la meta de ventas establecida para julio de 2016.

44. Las partes estipularon que, en términos generales, la querellante tuvo un buen desempeño en ventas con la empresa querellada, no así para tratar otros asuntos laborales, sus comportamientos en el manejo de ciertas situaciones, su falta de comunicación y compañerismo, entre otros acaecimientos disciplinarios que venían surgiendo desde el 2016 hasta hi fecha en que fue despedida en 2022.

45. Durante la toma de su Deposición se le preguntó ala querellante sobre el memo fechado 17 de julio de 2016, entregado por el gerente Henry Berges a la querellante.

46. A la querellante se le indicó en el memo fechado 17 de julio de 2016 que le entregó el gerente que el Sr. Ramírez o cualquier otra persona asignada sería la encargada de atender cualquier situación que surgiera en el departamento en su ausencia del Sr. Henry Berges.

47. A le querellante se le indicó en el memo fechado 17 de julio de 2016 que la entregó el gerente Henry Berges que la

persona asignada, Sr. Ramírez o cualquier otra persona asignada, debía ser respetada y su autoridad debía ser considerada.

48. La querellante admitió que recibió el memo fechado 17 de julio de 2016.

49. Durante la toma de su Deposición, la querellante adujo como razón para no firmar el memo de 17 de julio de 2016, "porque yo fui a aclarar lo de la lista que realmente hay una, unas reglas a seguir a la hora de, de hacer la lista del turno se había tachado, que no se puede tachar. [...] Yo fui donde el gerente, que era el que estaba de turno, que era el señor Ramírez y me indicó que la lista se quedaba así. Cuando llegó el señor Berges, el señor Berges lo corrigió y dijo, botó la, botó la lista, cogió la lista, completamente a la basura y la hizo nueva."

50. La querellada se reunió con la querellante para aclarar su alegación sobre el orden de la lista de vendedores, reconoció la postura de la trabajadora y los turnos permanecieron conforme a la lista inicial.

51. El memo fechado 17 de julio de 2016 indica que, a pesar de que el gerente Henry Berges habló con la querellante y atendió su reclamo esta no quedó conforme.

52. El asunto del memo fechado 17 de julio de 2016 fue referido a la atención del área de recursos humanos de la querellada por razón de la querellante no haber quedado conforme.

53. Según surge de la Hoja de Manejo de Situación de 20 de julio de 2016, la querellante participó en una reunión en al área de recursos humanos de su expatrono; en la cual se reconoció que tenía cazón sobre los procedimientos de ventas establecidos y el orden de la lista de vendedores.

54. La mencionada Hoja de Manejo de Situación de 20 de julio de 2016 fue firmada por la querellante.

55. Las partes estipularon que la querellante tenía conocimiento que de no encontrarse el Sr. Henry Berges, gerente de ventas, el Sr. José Ramírez determinaría cómo atender cualquier situación que surgiera en el Departamento de Ventas de la querellada.

56. Las partes estipularon que el 17 de julio de 2016. el Si Henry Berges, gerente de ventas, amonestó al Sr. Jorge Ortiz, ejecutivo de ventas de la querellada, por haber alterado los procesos establecidos en el Departamento de Ventas de la querellada, los cuales deberían ser discutidos con el gerente de ventas, previo a tomar una decisión.

57. Las partes estipularon que el Sr. Henry Berges, gerente del Departamento de Ventas de Alberic Mitsubishi, el 20 de julio de 2016, le informó a la querellante que, "nos preocupa la forma y manera en que usted hizo su reclamo sobre el orden de la lista, de vendedores, la cual no fue la apropiada, toda vez que comenzó realizando comentarios inadecuados hacia sus compañeros, los cuales generaron una discusión en el *showroom* del concesionario, creando así un ambiente no laboral, <u>conduta no será tolerada en el lugar de trabajo</u>." (Subrayado en original)

58.  Según surge de la Hoja de Manejo de Situación de 20 de julio de 2016, la querellada le indicó a la querellante que "le reclamó a Jorge Ortiz en alta voz y usted le indicó: 'No tengo que recibir órdenes de usted, porque usted no es gerente, usted es un vendedor igual que yo.'"

59. Conforme al manejo de la situación documentada por la querellada e1 20 de julio de 2016, a la querellante se le indicó que la conducta entre compañeros no será tolerada en el lugar de trabajo.

60. La parte querellada le exhortó a la querellante que para evitar caer en prácticas de insubordinación y/o ambiente no profesional entre compañeros, las alegaciones y/o reclamos diarios debían ser canalizados a través del gerente en turno, cónsono con el manejo de la situación documentada por Ja querellada el 20 de julio de 2016.

61. La querellante admitió durante la toma de su Deposición que participó en un seminario de capacitación al cual fue referida por el incidente de julio de 2016 y que la razón por la cual su expatrono la envió fue "por algo que había sucedido entre el señor Ramírez y, y yo [querellante]".

62. Surgen de las amonestaciones disciplinarias de la querellante que las acciones disciplinarias impartidas a la querellante trataban sobre temas de actitud y conducta en el empleo con sus compañeros de trabajo en ALBERIC.

63. Las partes estipularon que la querellante admitió a la querellada: "Reconozco soy de carácter fuerte y no soy fácil" y la querellada la refirió a un Seminario de Capacitación 'Expande tu Potencial con Inteligencia Emocional', celebrado los días 19 y 26 de agosto de 2016.

64.  Las partes estipularon que el 19 y 26 de agosto de 2016, la querellante participó en el Taller profesional intitulado: 'Expande tu potencial con inteligencia Emocional'; 'Entiende y Maneja tus Emociones para vencer obstáculos y Generar Resultados Positivos' ofrecidos por la Psicóloga Industrial-Organizacional, Dra. Yarizel Rodríguez, el cual fue sufragado por la querellada.

65. Las partes estipularon que la querellante no cumplió con la meta de ventas establecida para el mes de septiembre de 2016.

66. Las partes estipularon que la querellante no cumplió con la meta de ventas de noviembre de 2016.

67. El 22 de marzo de 2017 la querellante recibió una amonestación escrita del gerente de ventas de la querellada.

68.  Surge del memo de 22 de marzo de 2017, entregado a la querellante, que mientras el gerente de financiamiento José Ramírez hacía entrega de los premios durante una actividad de premiación de los ejecutivos de ventas de Alberic esta realizaba ruidos y gestos con la boca de forma burlona.

69. Ese mismo día, 22 de marzo de 2017, mientras la querellante estaba reunida con el gerente de ventas, Sr. Henry Berges y el Sr. José Ramírez, esta en actitud hostil y desafiante se dirigió al Sr. Ramírez diciéndole que era un hipócrita.

70. Surge del memo de 22 de marzo de 2017 que el Sr. Henry Berges, gerente de Ventas de la querellada, le llamó la atención a la querellante, por su actitud hostil y desafiante hacia al Sr. Ramírez, gerente de financiamiento de la querellada.

71. En el memo de 22 de marzo de 2017 se le indicó a la querellante que entre compañeros de trabajo debe prevalecer el respeto en todo momento y que de surgir cualquier inconveniente o discrepancia debía trabajarse a través de los canales correspondientes.

72. El memo de 22 de marzo de 2017 indica que el Sr. Ramírez era un gerente del departamento y que este debía ser tratado en todo momento con respeto.

73. En el memo de 22 de marzo de 2017, entregado por la querellada a la querellante, se indica que ese tipo de comportamiento no es permitido en la empresa y que, de volver a ocurrir una situación de esa índole se tomarían las acciones disciplinarias de rigor que pueden incluir desde una suspensión hasta la separación permanente de empleo.

74. Surge del contenido de las medidas disciplinarias por suspensión de empleo y sueldo de 6 de septiembre de 2013, manejo de situación de julio de 2016 y en el memo de 22 de marzo de 2017 que la parte querellada le había advertido a la querellante que su comportamiento no era permitido y que de continuar con esa situación se podrían tomar acciones disciplinarias más severas, incluyendo el despido.

75. Durante su deposición se le preguntó ala querellante sobre el memo de 22 de marzo de 2017 y alegó que no recordaba el evento surgido con el Sr. Ramírez.

76. La querellante leyó el memo de 22 de marzo de 2017 durante su deposición y testificó que "pienso que no vi el documento antes y así en mente... sí fue una actividad que... las actividades eran fuera del 'dealer'[...]."

77. Las partes estipularon que la querellante no cumplió con la meta de ventas establecida para el mes de abril de 2017.

78. El 12 de marzo de 2018 se celebró una reunión en las oficinas centrales de la querellada con el gerente general, la directora de recursos humanos, *Financial and Insurance Manager* (F & 1), el gerente de ventas y la querellante para tratar asuntos y comportamientos de la querellante que vienen ocurriendo desde julio de 2016 al presente, falta de comunicación y compañerismo y sobre la relación laboral entre los empleados.

79. La querellante alegó en la Minuta de 15 de marzo de 2018 que lo redactado en el primer párrafo era incorrecto, ya que después del 2016 el Sr. Ramírez y ella han trabajado en paz hasta el 18 de enero de 2018, por un incidente de un caso en que el Sr. Ramírez le llamó problemática y conflictiva en presencia del gerente de ventas, Sr. Henry Berges.

80. Las partes estipularon que en la Minuta fechada 15 de marzo de 2018 se esbozaron los planteamientos de la reunión celebrada el 12 de marzo de 2018 en las oficinas centrales de la querellada.

81. Surge de la Minuta de 15 de marzo de 2018 que la querellada todavía estaba trabajando la falta de

comunicación y compañerismo suscitada desde julio de 2016 entre el Sr. Ramírez y la querellante.

82. El 15 de marzo de 2018 la querellante suscribió con su firma la Minuta de la reunión del 12 de marzo de 2018.

83. Surge de la Minuta de 15 de marzo de 2018 que la querellada ha tomado las medidas necesarias con la querellante mediante la celebración de reuniones y costeándole su participación en seminarios, agotando los recursos para el mejor bienestar de todos y para continuar trabajando en equipo como profesionales.

84. Surge de la Minuta de 15 de marzo de 2018 que la conducta que hasta el día de hoy ha mantenido la querellante y el Sr. Ramírez no son permitidas por la parte patronal querellada.

85. Surge de la Minuta de 15 de marzo de 2018 que no se ha visto mejoría con la querellante por lo que la querellada se vio obligada en reunirse nuevamente con esta por los mismos hechos.

86. Surge de la Minuta de 15 de marzo de 2018 que ese es el último llamado de la querellada para dar por finalizado cualquier discrepancia que pueda surgir entre la querellante y el Sr. Ramírez.

87. La parte querellada le indicó a la querellante y al Sr. Ramírez; que quedaban advertidos e informados qu la próxima falta cometida, las cuales de ninguna manera son permitidas en la empresa, ambos quedarían separados de sus posiciones de trabajo.

88. Según la suspensión de empleo y sueldo de 6 de septiembre de 2013, el manejo de situación de julio de 2016, el memo de 22 de marzo de 2017; y, la minuta de 15 de marzo de 2018, la querellada apercibió a la querellante que podría tomar medidas disciplinarias más severas, incluyendo su despido, de esta continuar incursionando en comportamientos no aceptados en el empleo.

89. Según la minuta de 15 de marzo de 2018, la próxima falta cometida por la querellante sería razón para la separación de su empleo.

90. Las partes estipularon que la querellante no cumplió con la meta de ventas de agosto de 2018.

91. Las partes estipularon quela querellante no cumplió con la meta de ventas establecida para abril de 2019.

92. El memo de 21 de noviembre de 2019 del gerente de ventas de la querellada indica que el Sr. Henry Berges se reunió con la querellante y con el Sr. José Acevedo para aclarar una situación y mediar un conflicto surgido entre ellos.

93. La querellante había sido advertida previamente que su comportamiento no era permitido y que de continuar con esta situación se podrían tomar medidas disciplinarias incluyendo el despido.

94. Las partes también estipularon los memorandos fechados 21 de noviembre de 2019 sobre situación con empleados y situación con teléfono celular.

95. Durante su Deposición, la querellante testificó sobre el incidente con el celular y dijo: "...y pues quedábamos el resto de los compañeros en él, en el pasillo y un día un compañero me dijo: Él te está grabando, ten cuidado. Él está grabando todo lo que" ... Y efectivamente, un día me da con mirar el teléfono y estaba grabando. Tomé foto del, del mismo, el señor Berges no se encontraba en el 'dealer' en ese momento, que es el gerente general y cuando el gerente general llegó, me senté con él y sí, estaba, estaba grabando..."

96. Durante su Deposición, al preguntársele sobre lo que alegaba el Sr. Acevedo, la querellante testificó que "[e]l alegó que hablaban de su persona, pero en el pasillo éramos muchos más vendedores... sabe, no era yo la única que estaba en el pasillo".

97. Las partes estipularon que el 21 de noviembre do 2019 la querellante informó a la querellada que un empleado estaba dejando su teléfono celular grabando las conversaciones que se efectuaban en el área y el gerente de ventas indicó: "Por mi parte, Henry Berges, les informé que se reportaría la situación y se archivaría en sus expedientes por tratarse de una situación intolerable" y "por ser una práctica inadmisible que puede conllevar la medida disciplinaria de la separación de empleo".

98. El gerente de ventas comunicó a la directora de recursos humanos de la querellada que la querellante se presentó a su oficina y le expuso que el empleado José Acevedo estaba dejando su teléfono celular grabando ¡as conversaciones que se efectuaban en el área.

99. En el memo de 21 de noviembre de 2019 que fu cursado a la directora de recursos humanos de la querellada por el Sr. Henry Berges este le indicó que habló con el empicado José Acevedo y este admitió la situación de la grabación con su celular atribuyéndolo a un error.

100. El memo de 21 de noviembre de 2019 del Sr. Henry Berges indica que el empleado Acevedo dijo que la situación de la grabación con su celular no sucedería nuevamente.

101. El Sr. Henry Berges le solicitó a la querellante que no hablara del empleado Acevedo a sus espaldas, según declaró sobre el memo de 21 de noviembre de 2019.

102. Surge del testimonio vertido por el Sr. Henry Berges en el memo que preparó el 21 de noviembre de 2019 que instruyó tanto a la querellante como al empleado Acevedo para que arreglaran sus diferencias, pero la querellante le indicó que no arreglaría las diferencias con el Sr. Acevedo.

103. La querellante no cumplió con la meta de ventas establecida para el mes de febrero de 2020 y la querellada "le exhortó a trabajar con más entusiasmo para poder lograr la meta el próximo mes."

104. La parte querellada informó a sus empleados el protocolo del manejo de casos de Covid-19.

105. La querellada exigió a los empleados que tenían que cumplir el protocolo del manejo del Covid-19.

106. Las partes estipularon que el 28 de agosto de 2020 la querellada cursó a todos los empleados de su grupo un recordatorio de los protocolos sobre el COVID-19, las nuevas

restricciones de la Orden Ejecutiva del Gobierno de Puerto Rico y cuándo se debían abstener de acudir al lugar de empleo.

107. La querellante firmó como leído y comprendido los protocolos sobre el COVID-19 de la querellada y las nuevas restricciones de la Orden Ejecutiva del Gobierno de Puerto Rico.

108. La querellante sabía cuándo se debía abstener de acudir al lugar de empleo conforme a lo establecido en el protocolo de manejo de exposición de personas con Covid-19 y las órdenes del Departamento de Salud de Puerto Rico, entre otros.

109. La querellante no cumplió con la meta de ventas establecida para febrero de 2021.

110. Las partes estipularon que la querellante cumplió con la meta establecida en ventas los meses de enero, marzo, abril, mayo, junio, julio, agosto, septiembre, octubre, noviembre y diciembre de 2021.

111. Las partes estipularon la segunda suspensión de empleo y sueldo de la querellante.

112. En diciembre de 2021, la querellante reveló haber compartido con alguna persona que había presentado síntomas de Covid-19.

113. La querellante indico en la hoja de registro de toma de temperatura de diciembre de 2021 que compartió con una persona que sufría de los síntomas de COVID-19.

114. El supervisor de la querellante, Sr. Henry Berges, instruyó a la querellante que debía irse y regresar con una prueba negativa de COVlD-19, pero esta dijo que no se iría.

115. La querellante se negó a seguir la instrucción impartida por su patrono de realizarse la prueba de COVID-19, luego de haber compartido con una persona que tenía los síntomas del COV1D- 19.

116. El 14 de diciembre de 2021, la querellante fue suspendida de empleo y sueldo hasta el 22 de diciembre de 2021, por haber compartido con una persona. con síntomas de COVID-19 y negarse a realizar la prueba conforme a lo requerido por las autoridades sanitarias ante la pandemia mundial.

117. La querellante se negó a acatar las instrucciones mandatarias por razones de salud durante la pandemia del COVID- 19 en el lugar de empleo.

118. Las partes estipularon que, del 14 de diciembre de 2021 al 22 de diciembre de 2021, la querellante fue suspendida de empleo y sueldo por haber compartido con una persona con síntomas de COVID-19 y negarse a realizar la prueba, "al no seguir la instrucción impartida".

119. La suspensión de empleo y sueldo redactada por el Sr Henry Berges indica que se procedió a suspender de empleo y sueldo a la querellante por su rebeldía, por no seguir las instrucciones impartidas.

120. Durante su Deposición la querellante leyó la suspensión de empleo y sueldo de 14 de diciembre de 2021 y lo admitió.

121. El concesionario de autos Alberic está ubicado en la Carretera Núm. 1 en Caguas donde existe un área frondosa de árboles que es propensa a que habiten animales abandonados, incluyendo perros o gatos.

122. La querellada Alberic ayuda, promueve y protege a perros o gatos que han sido abandonados llevándolos a albergues o diferentes lugares de refugio de animales o adoptándolos como mascota y ofreciéndoles comida y refugio para una mejor vida.

123. Para el 2021 la querellada había adoptado un gatito color blanco y negro llamado Silvestre que encontraron dentro de un vehículo de motor en Alberic.

124. Desde el 2021, el gatito Silvestre era la mascota del concesionario de vehículos querellado, cuando todavía la querellante trabajaba para Alberic.

125. La querellante declaró bajo juramento que el gatito Silvestre se pasaba mayormente dentro del dealer querellada.

126. La querellante declaró bajo juramento que el gatito Silvestre era alimentado por Eileen Torres, una compañera de trabajo. quien le daba agua y comida.

127. Con anterioridad a haber adoptado al gatito Silvestre, en las afueras del concesionario de Alberic vivían aproximadamente entre quince (15) y veinte (20) gatos.

128. El 4 de enero de 2022, la querellante se vio involucrada en un incidente con el gatito mascota de Alberic, Silvestre.

129. Durante la Deposición, la querellante testificó que la querellada disponía de una línea de quejas o *holline* en Alberic,

130. Durante la Deposición la querellante testifico sobre la ubicación del "hotline" o línea de quejas, el propósito y que tales quejas o comentarios eran recibidos por el presidente de la querellada.

131. El 15 de enero de 2022, el Sr. Alberic Colón, presidente de la querellada recibió un correo electrónico proveniente del "hotline".

132. El correo electrónico del 15 de enero de 2022 proveniente del *hotline* lee: "No suelo ser una persona que critica o se queja sobre lo que observa en los negocios, pienso que [es] una pérdida de tiempo, no obstante me e[sic] encontrado debatiendo internamente si debo escribir lo que presenci[é] el 4 de enero del 2022 como a las lo de la mañana cuando me encontraba en facilidades de Alberic Mitsubishi en Caguas mientras esperaba por un familiar en un área de servicio decido pasar por el área de ventas y ver los nuevos modelos en el "showroom", cuando vi a una empleada de pelo largo y negro patear un gatito blanco y negro frente a des empleados más, solo estos empleaos no reaccionaron a lo sucedido, esto no es una conducta aceptable, *ni mi* in[sic] en escribir esto es que orienten a sus empleados sobre el maltrato de animales, no es una buena imagen para el dealer."

133. El presidente de la querellada le envió un correo electrónico al Sr. Henry Berges, gerente de ventas, anejando el mensaje recibido a través del "hotline" para que investigara el asunto.

134. El gerente de ventas revisó el video obtenido por el personal de tecnología y procedió a grabarlo en un archivo digital.

135. Como resultado de la comunicación recibida por el "hotline" y la revisión de las imágenes captadas en el video del 4 de enero de 2022, la querellada inició una investigación para corroborar las alegaciones presentadas en autos.

136. Durante la investigación realizada sobre el incidente del 4 de enero de 2022 se entrevistaron y se tomaron declaraciones a los dos (2) empleados que presenciaron ese día lo sucedido entre la querellante Rodriguez y la mascota de Alberic, el gatito Silvestre.

137. El Sr, Abdel Guindín, gerente general de la querellada, y el Sr. Henry Berges, gerente de ventas, observaron las imágenes captadas el 4 de enero de 2022, por el video grabado en un archivo digital.

138. El video que observó la querellante fue el mismo video que el gerente de ventas de la querellada obtuvo del personal de tecnología de la empresa y grabo en un archivo digital.

139. Del video que grabó el incidente del 4 de enero de 2022 surge que las imágenes captaron cuando previo a entrar la querellante al comedor, el gatito ya se encontraba en el pasillo justo al lado de la puerta de entrada al comedor.

140. El video del incidente del 4 de enero de 2022 captó las imágenes de la querellante cuando esta sacó el jugo de la nevera y al salir del comedor se encuentra de frente con el gato.

141. Surge del video del incidente del 4 de enero de 2022 que cuando la querellante salió del comedor que la querellada no se encontraba tomando el jugo, sino que esta salía con el jugo en la mano.

142. Las imágenes del video del incidente del 4 de enero de 2022 también captaron cuando saliendo del comedor la querellante se encuentra de frente con el gato y saca el pie hacia atrás y procede a pateado.

143. Del video sobre el incidente del 4 de enero de 2022 surge que el gato se "echa para atrás" por razón de la patada de la querellante.

144. Del video sobre el incidente del4 de enero de 2022 surge que dos (2) empleados de Alberic se encontraban en el lugar donde la querellante pateó al gatito.

145. Durante la Deposición tomada a la querellante esta admitió bajo juramento que observó el video cuando se sentó con el Sr. Guindín y el Sr. Berges la tarde del 17 de enero de 2022 para hablar sobre lo ocurrido.

146. El Sr. Henry Beiges y el Sr. Abdel Guindín se reunieron con la querellante para escuchar la versión de lo sucedido sobre el incidente del 4 de enero de 2022.

147. La parte querellada exigía a sus empleados el cumplimiento de sus deberes, funciones y responsabilidades.

148. A la empresa querellada, no le era requerido tener un reglamento interno con una lista taxativa de normas y conductas para evaluar a sus empleados.

149. La querellante reconoció que si no cumple con las políticas y procedimientos establecidos por la parte querellada podía estar sujeta a acciones disciplinarias, incluyendo el despido.

150. La parte querellada investigó los incidentes en que la querellante se vio involucrada y evaluó la razonabilidad de las medidas disciplinarias previamente aplicarlas.

151. Las partes conocían que no todas las normas a cumplir en el establecimiento tenían que constar por escrito para que surtiera validez.

152. En las políticas de la querellada se establecen algunas normas y procedimientos cuyas violaciones conllevan acciones disciplinarias, incluyendo el despido.

153. En las políticas de la querellada se establecen que los empleados pueden estar sujetos a disciplina, incluyendo la terminación inmediatamente de empleo.

154. La parte querellada le notificó a la querellante con razonable anterioridad que presentaría en evidencia el video del 4 de enero de 2022, sobre el incidente con el gatito en que ella se vio involucrada en Alberic.

155. La parte querellada presentó en evidencia ante la OMA un archivo digital autenticado de la grabación del video obtenido por el personal de tecnología de Alberic del evento acaecido el 4 de enero de 2022.

156. La parte querellada incluyo en el informe Conferencia con Antelación A la Vista como evidencia que utilizaría durante la celebración de la vista en su fondo para adjudicar la querella de epígrafe ante este Honorable Foro el archivo digital de la grabación del video obtenido por e] personal de tecnología de Alberic sobre el incidente en que la querellante se vio patear al gatito el 4 de enero de 2022.

157. La representación legal de la parte querellada informó a la parte querellante y a esta juzgadora que presentaría el video en evidencia utilizando su computadora, *pendrive* y monitor durante la vista a ser celebrada en este caso ante la OMA del Departamento.

158. Esta juzgadora emitió RESOLUCIÓN INTERLOCUTORIA y ORDEN ratificando lo informado por la parte querellada respecto al uso en Sala del video que grabo el ultimo evento de disciplina progresiva en que la querellante se vio involucrada en el concesionario de venta de automóviles Alberic.

159. La querellante admitió que tenía conocimiento que el área donde surgió el incidente con el gatito en Alberic era monitoreada por cámaras de seguridad.

160. Las partes participaron en la celebración de varias vistas administrativas ante la OMA para dirimir la controversia jurídica de autos.

161. La querellada le aplicó a la querellante la medida disciplinaría de suspensión de empleo en dos (2) ocasiones.

162. La querellante admitió que recibió de la. querellada la suspensión de empleo y sueldo fechada 26 de septiembre de 2013 y la firmó.

163. La querellante admitió que recibió de la querellada la suspensión de empleo y sueldo fechada el 14 de diciembre de 2021.

164. Previo al incidente del 4 de enero de 2022 que la querellante tuvo con el gatito, surgía del expediente de personal que esta estuvo involucrada en varios incidentes por problemas de actitud y conducta: el 6 de septiembre de 2013, en julio de 2016, 22 de marzo de 2017, el 15 de marzo de 2018, el 21 de noviembre rio 2019; y, el 14 de diciembre de 2021.

165. Basado en la investigación realizada, las imágenes captadas por el video del 4 de enero de 2022, las entrevistas realizadas a los empleados que presenciaron el incidente de la patada que la querellante le rilo al gatito del concesionario Alberic, parte querellada, y el historial de disciplina progresiva impartido a la querellante, la parte querellada tomó la determinación de culminar la relación de empleo con esta.

166. La parte querellada tendría que aplicarle la última medida disciplinaria anunciada a la querellante por esta incurrir en otro incidente disciplinario en la empresa, la terminación de empleo.

167. El 18 de enero de 2022, la parte querellada despidió a Ja querellante de su empleo aduciendo justa causa al palio de la aplicable Ley Núm. 80, *supra.* y que no le correspondía el remedio correspondiente a la mesada básica e indemnización progresiva.

168. La querellante y Ja parte querellada dilucidaron en vanas ocasiones la forma de tratar sus asuntos y comportamientos. la relación laboral existente entre los empleados, la falta de comunicación y compañerismo de esta y fue objeto de aplicación de varias medidas disciplinarias desde julio de 2016 hasta la fecha de su despido en enero de 2022, aunque hubo otras previamente.

169. La única reclamación presentada por la querellante en la querella contra su expatrono es por razón de despido injustificado al palio de la. Ley Núm. 80, *supra,* pre-promulgación de la Ley Núm. 4, *supra.*

170. La parte querellada lo aplicó a la querellante las medidas disciplinarias que conforman la disciplina progresiva.

171. La querellante no es acreedora de la indemnización legal recabada al palio de la Ley Núm. 80, *supra,* pre-promulgación de la Ley Núm. 4, *supra.*[11]

---

[11] Apéndice del recurso, Anejo 2, págs. 66-75.

La OMA resolvió que procedía desestimar la *Querella* instada por la recurrente en virtud de que la recurrida rebatió la presunción en cuanto a que el despido fue injustificado conforme el estándar de prueba de la Ley Núm. 80, supra. Determinó que Alberic justificó, a través de la prueba anejada en *la Moción de Sentencia Sumaria,* que la recurrente desplegó una conducta impropia y contraria a los estándares y reglamentación de la empresa y que dicho comportamiento tornó el ambiente laboral en uno intolerable. Incluso, la recurrida le concedió varias oportunidades a Rodríguez Arroyo para que mejorara su conducta, pero no hubo mejoría. Además, la OMA resolvió que Rodríguez Arroyo agredió al gato Silvestre de forma maliciosa, y no por temor hacia el felino. Por otro lado, determinó que la recurrente no controvirtió los hechos esenciales presentados por Alberic y, por tanto, no mantuvo la presunción que le asistía. En consecuencia, determinó que Alberic despidió justificadamente a la recurrente.

En desacuerdo, el 9 de mayo de 2025, la recurrida presentó una *Moción de Reconsideración*[12] ante la OMA, la cual no fue atendida en el término dispuesto para ello.

Inconforme con la determinación de la OMA, el 23 de junio de 2025, la parte recurrente compareció ante nos y señaló los siguientes señalamientos de error:

> Primer Error: Erró la Honorable OMA al desestimar la querella ya que en el presente caso no procede el uso del mecanismo de sentencia sumaria puesto que involucran controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia, y de credibilidad.
>
> Segundo Error: Declarar ha lugar la moción de sentencia sumaria presentada por la apelada y dictar sentencia sumariamente contraria a derecho puesto que sustentó su sentencia en prueba documental inadmisible y en manifestaciones inadmisibles por constituir ambas pruebas de referencia o declaraciones para beneficio propio (self-serving)
>
> Tercer Error: Erró la Honorable OMA al determinar que el incidente con el gato es uno de naturaleza grave y concluir

---

[12] Apéndice del recurso, Anejo 10, págs. 586-599.

que la querellante intencionalmente pateó un gato que es mascota de la querellada. Particularmente cuando Alberic Motors no tiene un Reglamento de Personal donde defina lo que es una conducta de naturaleza grave que amerite el despido.

Cuarto Error: Erró la Honorable OMA al tomar en consideración acciones disciplinarias previas y remotas para justificar el despido de la querellante. Ya que estas acciones disciplinarias son remotas y no afectaron el normal y buen funcionamiento de la empresa. Ejemplo de ello, es que la parte querellada no aceptó la carta de renuncia que hiciera la querellante a principios del mes de junio de 2016.

El 22 de julio de 2025, la parte recurrida compareció mediante *Alegato en Oposición a recurso de Revisión Judicial.*

Con el beneficio de la comparecencia de las partes, así como con la copia certificada del expediente administrativo, nos disponemos a resolver el recurso que nos ocupa.

## II.

## A.

Sabido es que los tribunales apelativos debemos otorgar amplia deferencia a las decisiones emitidas por las agencias administrativas, puesto que estas cuentan con vasta experiencia y pericia para atender aquellos asuntos que se les han sido delegados por la Asamblea Legislativa. *Otero Rivera v. Bella Retail Group, Inc. y otros*, 2024 TSPR 70; *Hernández Feliciano v. Mun. Quebradillas*, 211 DPR 99 (2023); *OEG v. Martínez Giraud*, 210 DPR 79 (2022); *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018). Es por ello, que, tales determinaciones suponen una presunción de legalidad y corrección que a los tribunales nos corresponde respetar, mientras la parte que las impugne no presente prueba suficiente para derrotarlas. *Transporte Sonnell, LLC v. Junta de Subastas de la Autoridad de Carreteras y Transportación de Puerto Rico y otro*, 2024 TSPR 82; *Otero Rivera v. Bella Retail Group, Inc. y otros, supra; Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 216 (2012). No obstante, tal norma

no es absoluta. Es por ello que nuestro Máximo Foro ha enfatizado que no podemos imprimirle un sello de corrección, so pretexto de deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho. *Voilí Voilá Corp. et al. v. Mun. Guaynabo*, 2024 TSPR 29, 213 DPR ___ (2023).

En *Torres Rivera v. Policía de PR*, 196 DPR 606, 628 (2016), nuestro Tribunal Supremo resumió las normas básicas en torno al alcance de la revisión judicial de la siguiente forma:

> [L]os tribunales deben deferencia a las decisiones de una agencia administrativa, pero ésta cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos, procede que se valide la interpretación que realizó la agencia administrativa recurrida. *Íd.* Véase, además, *Voilí Voilá Corp. et al. v. Mun. Guaynabo, supra,* y *Super Asphalt v. AFI y otro, supra,* pág. 819.

El criterio rector bajo el cual los tribunales deben revisar las decisiones administrativas es el criterio de razonabilidad. *OEG v. Martínez Giraud,* supra; *Super Asphalt v. AFI y otro,* supra, pág. 820; *Graciani Rodríguez v. Garaje Isla Verde,* supra, pág. 127; *Torres Rivera v. Policía de PR,* supra, pág. 626. Bajo este criterio, se limita la revisión judicial a dirimir si la agencia actuó de forma arbitraria o ilegal, o de manera tan irrazonable que su actuación constituya un abuso de discreción. *Íd.*

Bajo este supuesto, la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, 3 LPRA sec. 9675 (LPAU), estableció "el marco de revisión judicial de las determinaciones de las agencias administrativas". *Otero Rivera v. Bella Retail Group, Inc. y otros, supra*; *Rolón Martínez v. Supte. Policía,* supra, pág. 35. La intervención del tribunal se limita a tres áreas, a saber: (1) si el remedio concedido por la agencia

fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si las conclusiones de derecho del ente administrativo fueron correctas. *Íd.,* págs. 35-36; *OEG v. Martínez Giraud,* supra; *Torres Rivera v. Policía de PR*, supra, págs. 626-627; *Batista, Nobbe v. Jta. Directores*, supra, pág. 217. Nuestro Máximo Foro ha expresado que esta intervención "debe ocurrir cuando la decisión administrativa no se fundamente en evidencia sustancial o cuando la agencia se equivoque en la aplicación de la ley". *Rolón Martínez v. Supte. Policía*, supra, pág. 36. Siendo así, aquellas determinaciones de hechos formuladas por el ente administrativo deberán sostenerse cuando estén basadas en evidencia sustancial que surja del expediente administrativo considerado en su totalidad. *Íd.; OEG v. Martínez Giraud,* supra; *Super Asphalt v. AFI y otro,* supra.

Por otro lado, las determinaciones de derecho pueden ser revisadas en su totalidad. Sec. 4.5 de la LPAU, 3 LPRA sec. 9675; *Rolón Martínez v. Supte. Policía*, supra, pág. 36; *Torres Rivera v. Policía de PR*, supra, pág. 627. No obstante, los tribunales deberán darles peso y deferencia a las interpretaciones que la agencia realice de aquellas leyes particulares que administra. *Íd.*

El Tribunal Supremo de Puerto Rico ha dispuesto que la deferencia que le deben los tribunales a la interpretación que haga el ente administrativo sobre aquellas leyes y reglamentos que le corresponde poner en vigor, cede si la agencia: "(1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales". *Torres Rivera v. Policía de PR*, supra, págs. 627-628; *OEG v. Martínez Giraud*, supra. Finalmente, nuestra más Alta Curia ha expresado que, conforme a lo anterior, el criterio administrativo no podrá prevalecer en aquellas instancias donde la interpretación estatutaria realizada por una

agencia provoque un resultado incompatible o contrario al propósito para el cual fue aprobada la legislación y la política pública que promueve. Así, "la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia". *OEG v. Martínez Giraud*, supra, pág. 11.

**B.**

El propósito de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, según enmendada, 3 LPRA sec. 9601 *et seq.* (LPAU), fue disponer un cuerpo de reglas mínimas que proveyeran uniformidad al proceso decisorio y reglamentario. *Municipio de Arecibo v. Municipio de Quebradillas*, 163 DPR 308, 317 (2004); Pagán Ramos v. FSE, 129 DPR 888 (1992). La esencia del trámite administrativo es su flexibilidad y no debe recargarse con el rigor formalista que se caracterizan los procesos judiciales. *Junta de Planificación v. JACL*, 109 DPR 210, 212 (1979). La Sección 3.13 de la LPAU, 3 LPRA sec. 9653, establece que "las Reglas de Evidencia no serán aplicables a las vistas administrativas, pero los principios fundamentales de evidencia se podrán utilizar para lograr una solución rápida, justa y económica del procedimiento". La no aplicabilidad de las Reglas de Evidencia en los procesos administrativos es que promueve que, "que lo justo impere sin las trabas procesales de los tribunales de justicia". *Otero v. Toyota*, 163 DPR 716, 733 (2005). Cónsono con lo anterior, los procedimientos administrativos promueven la solución rápida, económica y justa de los procedimientos. *Otero v. Toyota, supra,* pág. 733.

Sobre la disposición sumaria de las controversias presentadas en las agencias administrativas, la LPAU establece un cuerpo de

reglas mínimas que provee uniformidad al procedimiento decisional de las agencias públicas en nuestra jurisdicción con el propósito de alentar la solución informal de las controversias administrativas. *Torres Santiago v. Depto. Justicia,* 181 DPR 969, 991 (2011). Dicho estatuto, además, faculta a las entidades administrativas a disponer de los asuntos ante su consideración mediante resolución sumaria, salvo que la ley orgánica de la agencia disponga lo contrario. *OCS v. Universal,* 187 DPR 164, 177 (2012); *Torres Santiago v. Depto. Justicia,* supra. En particular, el inciso (b) de la Sección 3.7 de la LPAU, 3 LPRA sec. 9647(b), dispone que:

[…]

(b)  Si la agencia determina a solicitud de alguna de las partes y luego de analizar los documentos que acompañan la solicitud de orden o resolución sumaria y los documentos incluidos con la moción en oposición, así como aqu[e]llos que obren en el expediente de la agencia, que no es necesario celebrar una vista adjudicativa, podrá dictar órdenes o resoluciones sumarias, ya sean de carácter final, o parcial resolviendo cualquier controversia entre las partes, que sean separable de las controversias, excepto en aquellos casos donde la ley orgánica de la agencia disponga lo contrario.

La agencia no podrá dictar órdenes o resoluciones sumarias en los casos en que (1) existen hechos materiales o esenciales controvertidos; (2) hay alegaciones afirmativas en la querella que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la petición una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derechos no procede.

A través de la resolución sumaria se puede aligerar "el proceso adjudicativo en casos en que no estén presentes los hechos materiales en controversia". *OCS v. Universal, supra.* En ese sentido, nada impide que una agencia pueda adjudicar sin celebrar una vista evidenciaria cuando no exista controversia sobre los hechos y, además, toda la evidencia documental que surge del expediente señale claramente la corrección de la determinación de la agencia. *Íd.,* pág. 178.

**c.**

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, es un vehículo para asegurar la solución justa, rápida y económica de un caso. *Serrano Picón v. Multinational Life Ins.*, 212 DPR 981 (2023); *Oriental Bank v. Caballero García*, 212 DPR 671 (2023); *González Meléndez v. Mun. San Juan et al.*, 212 DPR 601 (2023); *Acevedo y otros v. Depto. Hacienda y otros*, 212 DPR 335 (2023); *Universal Ins. y otro v. ELA y otros*, 211 DPR 455 (2023). Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. 32 LPRA Ap. V, R. 36.1 y 36.2.

En lo pertinente, la Regla 36.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36.1, faculta a una parte que solicita un remedio presentar una moción para que se dicte sentencia sumaria a su favor sobre la totalidad o cualquier parte de esta. Seguido, dicho mecanismo les permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no exista controversia material de hecho que requiera ventilarse en un juicio plenario y el derecho así lo permita. *León Torres v. Rivera Lebrón, 204 DPR 20, 41 (2020).* Esto es, el tribunal podrá dictar sentencia sumaria parcial para resolver **cualquier controversia que sea separable de las controversias restantes**. *Camaleglo v. Dorado Wings, Inc.*, 118 DPR 20, 25 (1986).

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* supra, pág. 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues se agiliza el proceso judicial, mientras simultáneamente se provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Segarra Rivera v. Int'l. Shipping,*

*et al.*, supra. Como se sabe, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. *Íd.*

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V, R. 36.3; *Oriental Bank v. Caballero García,* supra; *Pérez Vargas v. Office Depot,* 203 DPR 687 (2019). Si la parte promovente de la moción incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 111 (2015).

Por otro lado, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación". *León Torres v. Rivera Lebrón,* supra, pág. 43. Por el contrario, quien se opone a que se declare con lugar esta solicitud viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho la parte promovente puesto que, si incumple, corre el riesgo

de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *Íd.*

Por ello, en la oposición a una solicitud de sentencia sumaria, la parte promovida debe puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra, pág. 44. Claro está, para cada uno de estos supuestos deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3. *Íd.* "En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa." *Íd.* De lo anterior, se puede colegir que, ante el incumplimiento de las partes con las formalidades de la Regla 36 de Procedimiento Civil de 2009, *supra,* la consideración de sus posiciones descansa en la sana discreción del Tribunal.

Sin embargo, la sentencia sumaria generalmente no procederá cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Cruz, López v. Casa Bella y otros*, 2024 TSPR 47, 213 DPR ___ (2024); *Acevedo y otros v. Depto. Hacienda y otros*, supra; *Segarra Rivera v. Int'l. Shipping et al.*, supra. Un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Oriental Bank v. Caballero García,* supra, pág. 679; *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012); *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).

**D.**

La Ley Núm. 80, *supra*, fue creada con el propósito de atender todo lo relacionado al despido de trabajadores en la empresa privada y las circunstancias en que un patrono así lo puede hacer. *Feliciano Martes v. Sheraton,* 182 DPR 368 (2011); *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894, 904 (2011). La Ley Núm. 80 se aprobó "con el fin primordial de proteger de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de su empleo mediante la aprobación de una ley que, a la vez que otorgue unos remedios más justicieros y consubstanciales con los daños causados por un despido injustificado, desaliente la incidencia de este tipo de despido". *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 424 (2013) citando, la Exposición de Motivos de la Ley Núm. 80. En esencia, dicha ley establece que todo empleado que sea despedido de su cargo, sin que haya mediado justa causa, tendrá derecho a recibir de su patrono una compensación conocida como la mesada. Artículo 1 de la Ley Núm. 80, 29 LPRA sec. 185a; *Rivera Figueroa v. The Fuller Brush Co.*, supra, pág. 905.

Por estar ante una legislación de naturaleza reparadora, los tribunales están obligados a interpretar la Ley Núm. 80 de manera liberal a favor de los derechos del trabajador, resolviendo toda duda a favor del obrero para así cumplir con sus propósitos eminentemente sociales y reparadores. *Rivera Figueroa v. The Fuller Brush Co.,* supra, pág. 906; *Whittenburg v. Col. Ntra. Sra. Del Carmen,* 182 DPR 937, 951 (2011). La Ley Núm. 80 también tiene una función coercitiva y, un objetivo desalentador contra el capricho patronal. *Íd.* Por tanto, la Ley Núm. 80 tiene un valioso propósito social y coercitivo, a saber, sancionar que un patrono despida a su empleado o empleada, salvo que demuestre una causa justificada

para ello. *Jusino et al., v. Walgreens,* 155 DPR 560, 571 (2001); Véase, además, *Romero v. Cabrer Roig,* 191 DPR 643, 653 (2014).

En ese orden, el Artículo 2 de la Ley Núm. 80, 29 LPRA sec. 185b, define, aunque no taxativamente, las instancias en que se justifica el despido de un empleado:

> Se entenderá por justa causa para el despido de un empleado aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:
>
> (a) Que el empleado incurra en un patrón de conducta impropia o desordenada.
>
> (b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.
>
> (c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
>
> (d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con esta sección.
>
> (e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.
>
> (f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.

Los primeros tres supuestos de justa causa para el despido son conductas atribuibles al empleado, mientras que los últimos tres se le atribuyen al patrono. *Romero v. Cabrer Roig,* supra, págs. 651-652*; Reyes Sánchez v. Eaton Electrical,* 189 DPR 586

(2013); *Whittenburg v. Col. Ntra. Sra. Del Carmen,* supra*,* pág. 950; *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364, 376 (2001). No obstante, en todos los casos, se considera despido justificado aquel cuya motivación responde al adecuado y normal funcionamiento del negocio, más no el caprichoso o arbitrario. *Íd.*, págs. 376-377; *Jusino et al., v. Walgreens,* supra, pág. 575; *Secretario del Trabajo v. G.P. Industries, Inc.,* 153 DPR 223 (2001). La conducta de un empleado puede ser motivo de justa causa para el despido por estar vinculada al buen y normal funcionamiento de la empresa. *Secretario del Trabajo v. G.P. Industries, Inc.,* supra, pág. 224. El empleado debe incurrir en un patrón de conducta impropia y desordenada o violenta las normas de la empresa. *Íd.*, págs. 244. La Ley Núm. 80 promueve que el despido no se produzca por mero capricho del patrono. *Íd.* Todo despido que no fuese basado en una justa causa es considerado injustificado y en el cual el empleado recibe el beneficio de un remedio exclusivo. *Díaz* v. *Wyndham Hotel Corp., supra,* pág. 378. El patrono tiene el peso probatorio de demostrar que el despido fue uno justificado por medio de preponderancia de la prueba, de lo contrario se presume que fue injustificado. *Díaz* v. *Wyndham Hotel Corp, supra,* pág. 388. Como cuestión de umbral, para que el empleado se beneficie de la presunción, esta se activa si: fue empleado de un comercio, industria u otro negocio; su contrato era por tiempo indeterminado; recibía remuneración por su trabajo, y que fue despedido de su puesto. *Rivera Figueroa* v. *The Fuller Bush Co.*, 180 DPR 894, 907.

La Ley Núm. 80, *supra,* no puede ser considerada un código de conducta que contenga una lista de faltas claramente definidas y la sanción que corresponda a cada una. *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.,* 209 DPR 759, 773 (2022), citando a *Secretario del Trabajo v. G.P. Industries, Inc.,* supra, pág. 223. Los patronos, pueden aprobar reglamentos internos y normas de

conducta en el lugar de trabajo que estimen necesarias y los empleados estarán sujetas a ellas, siempre que estos cumplan con un criterio de razonabilidad. *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.*, *supra*, pág. 773.

Ahora bien, los patronos deben pagar una mesada a los empleados que son despedidos sin justa causa. *SLG Zapata* v. *J.F Montalvo*, 189 DPR 414, 424 (2013). Todo despido que no fuese basado en una justa causa es considerado injustificado y en el cual el empleado recibe el beneficio de un remedio exclusivo. *Díaz* v. *Wyndham Hotel Corp.*, 155 DPR 364, 378 (2001). El patrono tiene el peso probatorio de demostrar que el despido fue uno justificado por medio de preponderancia de la prueba, de lo contrario se presume que fue injustificado. *Íd.,* pág. 388. Como cuestión de umbral, para que el empleado se beneficie de la presunción, esta se activa si: fue empleado de un comercio, industria u otro negocio; su contrato era por tiempo indeterminado; recibía remuneración por su trabajo, y que fue despedido de su puesto. *Rivera Figueroa* v. *The Fuller Bush Co.*, *supra*, pág. 907. Sin embargo, la Ley Núm. 80 sufrió varias enmiendas ante la aprobación de la Art. 1.2 de la Ley de Transformación y Flexibilidad Laboral, (Ley Núm.4), según enmendada, 29 LPRA sec. 121a. Una de las enmiendas aprobadas fue el orden de prueba puesto que se eliminó la frase que le imponía al patrono el peso de la prueba. *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.*, *supra*, pág. 776. La citada ley, dispone que los empleados, previo a la vigencia de la ley, gozan de los derechos y obligaciones que tenían previamente. *Íd.* Sin embargo, la Ley Núm. 4, *supra*, no contiene la frase de que le imponía el peso de la prueba al patrono. *Íd.* Así pues, la Ley Núm. 4-2017, *supra*, es aplicable de acuerdo con el momento de los hechos. *Íd.*

**III.**

Por estar relacionados el primer y segundo señalamiento de error, los discutiremos en conjunto.

En esencia, la recurrente sostiene que no procede la adjudicación sumaria ya que existen hechos materiales en controversia que involucran elementos subjetivos de intención y malicia. Asimismo, la recurrente alega que la OMA incidió en resolver sumariamente la controversia debido a que admitió prueba documental inadmisible conforme a las Reglas de Evidencia, 32 LPRA Ap. V.

Luego de un examen sosegado del expediente ante nos, así como de los estatutos aplicables, entendemos que el análisis planteado por la recurrente no refleja lo resuelto por el Tribunal Supremo.

Sabido es que debemos brindarle deferencia a las determinaciones de hechos que esbozan las agencias administrativas. En reiteradas ocasiones, este Tribunal ha resuelto que no intervendremos en las determinaciones de hecho de una agencia salvo que si la determinación administrativa no está basada en evidencia sustancial; el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o la actuación administrativa lesionó derechos constitucionales fundamentales. De lo contrario, debemos abstenernos en modificar las determinaciones de hechos que formule la agencia toda vez que el foro administrativo evaluó la prueba desfilada ante su consideración.

Como corolario de lo anterior, el procedimiento administrativo promueve la solución rápida, justa y eficaz de las controversias planteadas en los foros administrativos. Con ello, la LPAU, *supra*,

no permite el uso de las Reglas de Evidencia, *supra,* en los procedimientos administrativos, toda vez que alteraría la naturaleza y flexibilidad de los trámites administrativos. Además, una agencia está facultada a disponer sumariamente de un caso si entiende que no existen hechos materiales en controversia.

Tras un análisis cuidadoso del expediente, resolvemos que no intervendremos en las determinaciones de hechos esbozadas por la OMA dado que no se configuran las circunstancias previamente descritas que nos autorizan a intervenir en los méritos de las determinaciones de hechos. Asimismo, concluimos que no existen hechos en controversia que impidieran la adjudicación sumaria del caso. Ahora bien, contrario a lo alegado por la recurrente, los elementos subjetivos no imposibilitan la disposición sumaria del caso. Nuestro ordenamiento jurídico no restringe la disposición sumaria de un caso pese a que la controversia esté relacionada al patrón de conducta de un empleado cesanteado. A esos fines, la OMA se limitó en atender los eventos, relacionados a la conducta de la recurrente, que conllevaron a su despido. Por tanto, la OMA podía disponer sumariamente el caso en vista de que no existían hechos en controversia que evitaran la disposición sumaria del caso.

De igual forma, resolvemos que la OMA actuó correctamente al no aplicar las Reglas de Evidencia, *supra,* puesto que atentaría contra la naturaleza del procedimiento administrativo. Con ello, durante las vistas administrativas, la OMA podía admitir prueba de referencia y no tenía que autenticar evidencia para que fuese admisible. Por consiguiente, coincidimos con las determinaciones de hechos emitidas por la OMA.

Por otro lado, la recurrente indicó en su tercer y cuarto señalamiento de error que fue despedida por conductas que no estaban contempladas en el Reglamento de empleados. A su vez, argumentó que las acciones disciplinarias en su contra fueron

remotas y no afectaron el buen y normal funcionamiento de la empresa.

Conforme a las normas jurídicas pormenorizadas, la Ley Núm. 80 autoriza a un patrono a despedir justificadamente a su empleado en tres supuestos distintos; entre ellos, si la conducta desplegada por el empleado afectó el buen y normal funcionamiento de la empresa. El Tribunal Supremo ha resuelto que, la conducta que exhiba el empleado debe ser un patrón de conducta que altere el ambiente laboral y la normativa de la empresa. No obstante, si un empleado fue contratado previo a la aprobación de la Ley Núm. 4, y es despedido, le asiste una presunción de que el despido fue injustificado. Así pues, le corresponde al patrono rebatir tal presunción y demostrar que el empleado fue despedido justificadamente.

En el presente caso, Alberic logró derrotar la presunción que le asistía a la recurrente. Ello, tras demostrar que la recurrente desplegaba una conducta hostil y, por tanto, afectaba el funcionamiento de la empresa. De los hechos se desprende que, en varias ocasiones, Rodríguez Arroyo fue amonestada por faltarle el respeto a sus compañeros y tener una conducta difícil en Alberic. Además, durante el COVID-19 ignoró e incumplió con la normativa de la empresa, por lo que fue suspendida. Igualmente, fue amonestada en diversas ocasiones por la empresa ante su actitud ofensiva en el ambiente laboral. En una ocasión, Rodríguez Arroyo aseveró que tenía un carácter fuerte y no era fácil, por lo que Alberic la envió a tomar un taller de capacitación profesional. Posteriormente, la recurrente pateó al gato de la empresa sin fundamento y frente a un cliente. Dicho evento alteró el estado anímico del cliente y de las personas que observaron el video de la recurrente agrediendo al gato Silvestre. Además, la recurrente no logró demostrar que la patada se debió a que le tenía miedo al felino.

Consta claramente en el video que, Rodríguez Arroyo intencionalmente pateo al gato Silvestre.

Ciertamente, Rodríguez Arroyo incurrió en un patrón de conducta que afectaba el funcionamiento de la empresa a consecuencia de su temperamento y trato desafiante con sus compañeros de trabajo. Es por eso que, Alberic tomó la decisión de despedir justificadamente a la recurrente y no por mero capricho. Más aún, la recurrida le concedió múltiples oportunidades a la recurrente para que cesara dicha conducta, pero esta mantuvo el mismo patrón. Por otro lado, Rodríguez Arroyo no refutó los eventos que dieron lugar a su despido con suficiente especificidad para persuadirnos de resolver contrario a la OMA.

En cuanto al argumento de la recurrente con respecto a que la conducta que acarrea el despido debe estar expresamente definida en el reglamento de personal, no le asiste la razón. En un reglamento, la conducta que conlleve el despido no tiene que estar expresamente definida, basta con que el empleado incurra en un comportamiento que afecte el desempeño de la empresa.

En mérito de lo antes expuesto, sostenemos la determinación de la agencia recurrida. Nada en el expediente de autos sugiere que el pronunciamiento que atendemos haya resultado en un ejercicio arbitrario atribuible a la OMA. Por tanto, en ausencia de prueba al contrario, confirmamos la *Resolución* recurrida.

**IV.**

Por los fundamentos que anteceden, confirmamos la *Resolución* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones